## Dotson, et al. v. Patterson, Trustee, et al.

(Decided October 1, 1914.)

### Appeal from Pike Circuit Court.

1. Attorney and Client—Alleged Misconduct of Attorney—Evidence. —In an action for specific performance, certain heirs intervene with a claim of misconduct of their attorney in inducing them to enter into a contract of sale of land, and ask a rescission. The evidence examined and held that the heirs were familiar with the land and its value; that they were impatient with the delay in clearing the title and obtaining the purchase price; that they agreed to the terms of sale before advising with their attorney, and that the attorney acted in good faith and as he believed for the best interest of his clients.

2. Attorney and Client.—While the law requires that there must be the utmost degree of good faith between attorney and client, subjecting the transaction complained of to the closest scrutiny, it cannot be said that the attorney did anything, or failed to disclose anything, to the detriment of his clients.

3. Specific Performance—Action to Compel—Evidence.—A sale of the land in controversy being the intention of the parties as shown by the contract, the heirs had the right to demand conveyance in accordance with its terms.

AUXIER, HERMAN & FRANCIS, JAMES M. ROBERSON, ROSCOE VANOVER and R. H. COOPER for appellants.

C. W. CAMPBELL and J. J. MOORE for appellees.

OPINION OF THE COURT BY JUDGE NUNN—Affirming.

This suit is for specific performance of a contract for sale of about 460 acres of coal lands in Pike county

The contract, which appears below, was made between the appellants, George W. Dotson and Elijah S. Wolford, of the one part, and the nine other children and heirs-at-law of Daniel Boone Wolford, deceased. Elijah S. Wolford, of the first part being one of ten children of Daniel Boone Wolford.

The appellee, Andrew W. Campbell, succeeded to the rights of the second parties, the nine children, by purchase, and seeks to enforce those rights against the appellants, Dotson and Elijah Wolford. The main difference between the parties here is the construction of the contract. As to the other nine children, who intervene and seek a rescission of their contract for the sale of their interest in the land to Campbell, the question is whether any fraud was practiced by their attorney, E. D. Stephenson, in inducing them to enter into the contract.

This tract of land has been a bone of contention in that community ever since 1900. Old man Boone Wolford, as above stated, was the father of ten children, and owned 530 acres of land. In January, 1901, he contracted to sell the coal rights under 200 acres of it to Ralph Steele and D. F. Wolford, for $300, and the same year, and a short while afterwards, he sold, in fee simple, 70 acres of the balance to W. R. Wolford. It might be added here, to explain the beginning of appellee Campbell's interest in it, that W. R. Wolford soon afterwards conveyed the coal rights under this 70 acres to Campbell.

In November following (1901), Boone Wolford, ignoring these sales, entered into a written contract with the Ohio & Big Sandy Land Association, and which contract was duly recorded, reciting that "he has sold and hereby agrees to convey to the grantee" the coal underlying the whole 530-acre tract, for a consideration of $2.00 per acre, $51.00 of which was paid in cash, and the balance was to be paid on demand, when accompanied by a complete survey and abstract showing good title. After this, Boone Wolford refused to execute a deed to Steele for the 200 acres, which he had agreed to convey to him, and Steele brought suit to enforce the contract. The circuit court adjudged a conveyance. On appeal to this court (27 K. L. R. 88-1177), the judgment was reversed on the ground of undue influence, but it was held that Steele was entitled to a lien on the land for the $300, which he had paid to Wolford, with interest. The case was returned with directions to enter a judgment to

that effect. This was in February, 1905, and Boone Wolford, finding himself unable to pay the lien debt to Steele, the appellants, George W. Dotson and E. S. Wolford, came to his relief, they say, and took a deed to themselves for the coals under the whole tract; that is, the coals under all his land except that under the seventy acres, which he had theretofore sold to, and was then in the possession of, Compbell. At one place in this deed to Dotson and Wolford, there is a statement that they were to pay $5.00 per acre, but the recited consideration was $1,000, cash in hand paid. In subsequent litigation between the children, it was contended that the real consideration paid to Boone Wolford was much less than $1,000.

In April, 1907, Boone Wolford having died, the other nine children, feeling very much aggrieved at Dotson and E. S. Wolford for the manner in which it was thought their father had been over-reached and defrauded in the sale of his property, employed E. D. Stephenson as their attorney, and instituted an action to cancel their father's deed on the ground of fraud and mental incapacity. Dotson and Wolford answered with a denial of all the allegations, and set up the fact that the Mason Coal Company was a necessary party, for the reason that it was the assignee of the Ohio & Big Sandy Land Association contract obtained from Boone Wolford in 1901, and alleging also that the Mason Company was asserting rights of title and ownership. The Mason Company, while answering with a claim of the property, seemed content with the encouragement it could give to the family fight in the hope of their ultimate exhaustion. E. D. Stephenson, attorney for the nine children, realized the danger of this situation, and suggested to his clients, and to Dotson and Wolford, the advisability of a compromise between themselves, and then a joint fight against the Mason Coal Company to cancel the old contract. Acting upon this suggestion, a contract of compromise was entered into and signed by the parties, and was incorporated in the court order dismissing the case as between the children and Dotson. As this contract is the foundation of the controversy, it is well to copy it in full:

"This cause is dismissed settled as between the plaintiffs and the defendants, E. S. Wolford and Geo. W. Dotson, and the settlement is fully set out in a written con-

tract signed by the parties, which is in words and figures as follows, to-wit:

"This agreement made and entered into this 25th day of June, 1908, by and between E. S. Wolford, and Geo. W. Dotson, parties of the first part, and J. H. Wolford, Moses Wolford, W. R. Wolford, Daniel Wolford, Polly Wolford, Minda Dotson, Clarinda Mounts, Kenas Mounts, Dorsey Mounts, Dolly McCoy, Sarah Eldridge and Lizzie Wolford, parties of the second part,

"Witnesseth: That whereas, there is a suit pending in the Pike Circuit Court between J. H. Wolford, &c. plaintiffs (all of whom are parties of the second part), and E. S. Wolford, &c. defendants, parties of the first part of this agreement, over the title to a tract of coal and mineral containing 450 acres, more or less, situated on the Boone Wolford Branch of Peter Creek, in Pike County, Ky., and bounded as follows: On the north by the lands of Harrison Charles; on the south by the lands of Majestic Coal Company; on the east by the lands of Dave Mounts; and on the west by the lands of J. G. Wolford. The parties hereto agree to settle the aforesaid suit among themselves on the following terms:

"First: It is agreed by and between the parties hereto that said E. S. Wolford and Geo. W. Dotson, together with their wives, for and in consideration of a sum equal to 200 acres of the aforesaid tract of mineral shall, when the title to said tract of minerals cleared up, execute a deed for all their right, title and interests in the aforesaid tract of mineral to any persons or corporation to whom said property may be sold by the parties hereto, provided said property shall not be sold for less than $25.00 per acre.

"Second: It is further agreed by and between the parties hereto, that upon the execution of the deed by the parties of the first part as provided hereinabove the parties of the second part, bind themselves to pay unto the parties of the first part, out of the proceeds of the sale of said property, them a sum equal to the value of 200 acres of said property at the price per acre realized out of the sale of same.

"Third: It is further agreed by the parties hereto that upon the execution of this agreement an agreed order shall be entered in said cause dismissing same as, settled as between the parties hereto.

"Witness the following signatures this, the day and year first above written."

With the suit settled as between the Wolford children, there was left pending the claim of the Mason Company, and that claim involved not only the 460 acres of the Wolford heirs, but the 70 acres of Campbell. When Attorney Stephenson bégan the action, he had a contract with the nine children that he was to receive a sum equivalent to 20% of the recovery. Stephenson claims that that contract was never altered, although he admits that when the compromise was made, some of the heirs inquired of him if he would make any concession, and he responded that he would do what was right about it. Some of the heirs swear that he agreed to take a fee certain of $750, and continue as attorney in their defense against the Mason Company. Dotson and Wolford corroborate this version, and say that it was agreed that they were to pay $50 of this fee. At all events, no part of the fee was ever paid by any of them, nor had anything ever been advanced to Stephenson with which to pay his expense in representing them, which, as Stephenson swears, was considerable.

In the hope of compromising and eliminating the claim of the Mason Company, and thus clearing up the title to the lands of himself and the Wolfords, Campbell, on his own initiative, opened negotiations with the Mason Company for the purchase of their claim, and offered $10 per acre for it. The local officials of the Mason Company received the proposition with favor, and submitted it to the chief officials with recommendation that it be accepted. Encouraged by this, Campbell, construing the Wolford compromise contract as giving the nine children the right to contract for the sale of the Wolford land, provided it was not sold for less than $25.00 per acre, opened negotiations with these nine children. This was in January or February, 1910. He discovered that Attorney Stephenson had an interest in it, under his employment contract, to the extent of 20% of its value, and he proposed to the children to pay $25.00 per acre and take upon himself an obligation to settle Stephenson's fee. These propositions were verbal, and in that way were accepted by each of the nine children. Prior to that, however, Campbell had purchased outright the interest of one of the children. In May, 1910, after receiving this assurance from the nine children, Campbell approached Stephenson, and told him of his verbal offer to his clients, and of their acceptance of it, and of his proposal to the Mason Company, and his belief that that

would be accepted. He, also, told Stephenson of his belief that he could then sell the whole of it, having secured clear title, to the Majestic Colliery Company, at $50 per acre. The appellant, Patterson, is one of the chief officials of that company. Campbell desired to know, if Stephenson, as attorney for the Wolfords, could approve their sale to him, and advise them to accept Campbell's offer. He, also, desired to know if Stephenson, in lieu of his 20% contract, or the $750 cash fee, which the Wolfords conceded was due him, would accept one-half of the net profits, which Campbell might realize from the purchase and sale of the property. In view of the pending claim of the Mason Company, Stephenson signified his approval of the sale by his clients to Campbell, and said that he would release them from their obligation to him and accept the proposed share in Campbell's profits.

During August of 1910, Campbell took title bonds from each of the nine heirs, agreeing to pay $25 per acre within one year, the trade to be closed in conformity with the compromise contract above set forth. Some of these title bonds were executed in Stephenson's office and in his presence. He does not deny that he approved of them, or that he may have advised the heirs to make them. He explains that the heirs were perfectly familiar, not only with the value of coal lands in this section, but of the nature of the claim which the Mason Company was setting up against them. Some of them, for many years, had been engaged as coal miners. The heirs insist that Stephenson did not tell them that Campbell had the land sold for $50 per acre. Stephenson says that he did not tell them this for the reason that it had not been sold, and he did not know it ever would be. But all concerned knew the purpose was to clear the title and sell the land. After he had taken the title bonds, Campbell received notice that the Mason Company had, on advice of their attorneys, rejected his proposition. Campbell, unwilling to let the deal fall through, offered to exchange 1,012 acres of land, which he owned in West Virginia, adjacent to some Mason Company's land over there, for the Mason Company's claim to the Boone Wolford land. This proposition was accepted without any hesitation, for it appears that the Mason Company had pending a sale of its West Virginia land to the Kentland Company, and, to close that deal, it was very necessary to include in it the Campbell land. As to the value of

the Campbell land, in West Virginia, it is shown that the Mason Company sold it, receiving 51% of the consideration in cash, and 49% in stock of the Kentland Company, and that this cash consideration was equal to $15.30 per acre. The failure of the Mason Company to accept Campbell's original proposition, materially delayed his plans for completing the purchase of the Wolford interests, and, the proof shows, they became very impatient and made repeated requests upon him to turn over the money and take their deeds. Having finally acquired the Mason Company claim, and in that way cleared the title, he began to pay over the money and take transfers from the Wolfords. Between April and November of 1911, he had secured deeds from the nine Wolford heirs. These deeds recited an absolute conveyance of their undivided interest in the property at $25.00 per acre, with directions to E. S. Wolford and G. W. Dotson, "to make deed of conveyance to S. W. Patterson, trustee, or join in this conveyance to him in conformity with the terms and conditions of the agreement entered into on the 25th day of June, 1908, between the parties of the first part and said E. S. Wolford and G. W. Dotson." As the deeds were taken from these nine children, their share of the consideration, as shown by the compromise contract, was paid over to them, and without delay Campbell and Patterson, as his trustee, requested of Dotson and Wolford that they convey the whole, according to the terms of the contract, and tendered them $5,000, that being the value of their 200-acre equivalent, at $25.00 per acre. Dotson and Wolford refused to accept the money or to make the conveyance, claiming that they were under no obligation by the contract, to make a conveyance at the behest of any of the nine children. In January, 1912, appellees brought this suit for specific performance, and the other nine children intervene with a claim of misconduct on the part of their attorney, Stephenson, and being in that way deceived and defrauded, they ask for a rescission of their deeds and title bonds.

At this point, it might be remarked, that these ten years of strife and dissension among the heirs had degenerated into an unseemly struggle between two rival coal corporations for possession of the property. While it is as valuable as any other land in that section for the coal underlying it, at least 200 acres of this land had a special value because of its location between the work-

ing places of these two large coal companies. As above indicated, Campbell contracted to sell the Wolford property, including his 70 acres, and approximately 100 acres more of his own land, at $50 per acre. It appears, that on his own land, there was a residence and other valuable improvements. It, also, appears that the nine Wolford children, apparent parties to this action, are not the real parties, for the undisputed testimony of a Mr. Charles and Mr. Wolford, acting, no doubt, for the other coal company, discloses that they are the holders by purchase (subsequent to Campbell's purchase) of all of these nine interests; subject to this litigation, under a contract, in the event of Campbell's defeat, to repay to him $25.00 per acre, and then to pay to the nine heirs on the basis of $12.50 per acre additional. Dotson and Wolford appear as refusing to make deeds for $25.00 per acre, or to Campbell or his trustee at any price.

This brings us to a consideration of the attitude of Attorney Stephenson, and the effect of it on the conveyance made by the nine children.

This court has been emphatic in its denunciation of anything amounting to fraud on the part of an attorney towards his clients; and it is the policy of the court, where complaint is made by a client, to examine critically transactions between them, that the rights of the client may be protected against any attempt of the attorney to secure any advantage to himself. "A person standing in the relation of an attorney must bring everything to the knowledge of his client that he knows pertaining to such position. Cases of undue concealment sometime arise from relation of client and attorney. In these cases, the law, in order to prevent undue advantage over the unlimited confidence which the relation naturally creates, requires that there must be the utmost degree of good faith in all transactions between the parties." Story's Equity Jurisprudence, Sec. 310; Palms Admr. v. Howard, 129 Ky., 668; Cline v. Charles, 124 S. W., 347; Hill v. Philips, 7 B. Mon., 308.

Subjecting the transaction, as far as Attorney Stephenson is concerned, to the closest scrutiny, we are unable to see that he did anything, or failed to disclose anything to the detriment of his clients. They knew that his fee was unpaid, and of their own volition, uninfluenced by Stephenson, they had agreed to trade on terms imposing upon Campbell payment or settlement of this fee, and there is no pretense that they did not

know that Stephenson had released them, and agreed to take a chance with Campbell on the sale of the property for a profit. The chief complaint is, that Stephenson did not disclose the fact that at the time he executed the title bonds, Campbell had already contracted to sell it at $50.00 per acre, whereas, they were only getting $25.00. It is clearly shown that it had not been sold. It was Campbell's belief that they could sell it for $50.00 per acre, if the title could be cleared, but how much it would cost to do that he did not know, and, in fact, the negotiations then pending for clearing this title failed and had to be renewed. When the claim of the Mason Company was finally purchased, it was at such increased expense, as the proof shows, that in reality, Stephenson will not get as much out of the profits as he was entitled to under his contract for a fee of 20%. We perceive no deception or fraud practiced upon them by Stephenson. On the contrary, we are impressed that he acted in good faith and for what he thought to be for the best interests of his clients. The complaint now coming against him, on this score, from strangers to the transaction, does not appeal to us with any favor. By unfair means they have worked up a feeling of dissatisfaction among the heirs, and for a cash consideration, have purchased that dissatisfied feeling, and offer it now against him. If, as it seems to us, the equities were against the children, certainly none are perceptible in the hands of their assignees under these circumstances.

This brings us to a consideration of the question, whether the nine heirs, that is, the second parties to the compromise contract, have a right to sell the property at $25.00 per acre, and compel Dotson and Wolford to make conveyance therefor.

The contract provides, in substance: That Dotson and Wolford shall hold the legal title, and that after the title is cleared, they would make a deed to any purchaser to whom it may be sold "by the parties hereto," provided, the sale be for not less than $25.00 per acre. Upon the making of such deed, the second parties, that is, the nine children, agreed to pay to Dotson and Wolford, the first parties, "a sum equal to the value of the 200 acres of said property at the price per acre realized out of the sale of the same." Singling out the clause, above quoted, which provides for a sale of the property "by the parties hereto," it would seem, that no valid contract for sale could be made without the concurrence and

assent of all the parties. But the appellees insist, that, considering the purpose of the contract, and reading it as a whole, the words quoted were intended to be "sold by the second parties hereto," and, therefore, they, the second parties, assumed the obligation of paying over to first parties the equivalent, in value, of the 200 acres, at the price per acre realized. It should be remembered that this compromise settled the case in which Dotson and Wolford were claiming the whole property to the exclusion of the nine children. The settlement recognized a present interest in the property on the part of all the Boone Wolford children, with a preference to Dotson and Wolford, to the extent of 200 acres in value. The land was not then divided, nor the several interests set apart to the heirs, for the reason that it was indivisible. Dotson and Wolford desired to take a particular 200 acres, and let the other heirs divide the residue between themselves. This 200 acres, because of its location between the two coal company properties, had a special value, and the other heirs were unwilling to agree that they might have that part of it. In order to make the division, it was realized that it would be necessary to sell the property. For this purpose, the contract was drawn in order to show the respective interests, and it clearly contemplates a sale with a requirement for Dotson and Wolford to convey, with the saving clause to them, that the sale shall not be for less than $25.00 per acre. With Dotson and Wolford having the legal title and being in possession, it was to the interest of the other children to bring about a sale as soon as possible, conformable to the terms of the contract, if they were to receive any benefits. We think a sale was the clear intention of all the parties, as shown by the contract considered as a whole, and that the nine children were to have the right to negotiate a sale for a consideration satisfactory to them, provided it be not less than $25.00 per acre, and if they could succeed in this, they had a right to demand or compel conveyance by the first parties. Any other construction than this, would in effect, nullify the contract, and deny to the second parties anything more than an expectancy in the property. To construe the contract, as giving to Dotson and Wolford the right to reject a sale and refuse the deed, although the price was $25.00, or more, would, in effect, leave them in the same position, they were before the compromise was entered into.

That is, they would be left as the holders of the legal title and in possession of the property, and, if, as might be suspected, they were inclined to have an eye for their own interests, rather than the interests of the other heirs, they would continue indefinitely as the owners of the legal title and the holders of possession. If it be conceded that the nine children secured any present benefit by the contract, it is necessary to give to it the construction insisted upon by appellees, and which the nine children placed upon it when they executed the title bonds and deeds. This was the view of the lower court.

Some other minor questions and collateral issues are raised on the original and cross-appeal, but considering the whole case, we are convinced that the judgment of the lower court did substantial justice, and it is, therefore, affirmed.